BARFIELD, next friend, vs. BARFIELD.

1. It would require a very strong case, supported by clear and convincing proofs from witnesses entitled to credit and uninfluenced by passion or prejudice, to authorize a court of equity to wrest from the father and head of a family a homestead which has been carved out of his estate, and on which he has lived and has raised to majority all of his children, except two, at whose instance the bill is filed, and to place such homestead in the hands of a receiver. In case of insanity of the father, or such tyrannical or inhuman conduct as would lower him from the scale of manhood to that of a brute, a receiver might be appointed; but no such case is made here.

2. Equity will not, at the instance of the two minor children of the applicant, enjoin the head of a family from applying to the judge of the superior court for leave to sell all or a part of the homestead, on the ground that he drinks to excess, has married a second wife, has had his affections alienated from them, is mismanaging the estate, and threatens to so manage it as to deprive them of all benefit therefrom.

(a.) Nor will equity enjoin a head of a family from cutting timber from the homestead lands and so using the place as in his judgment, will best help to support the family, including the maintenance and education of the complaining minors.

(b.) Where a homestead was carved out of the estate of the head of a family at the instance of his first wife, and after her death he again married, the second wife became a member of his household, a participant in the homestead and the support and comforts derived therefrom, and a recipient and beneficiary of the estate while it existed,—that is, as long as the family lived within the curtilage of home and was not broken up by the death of parents and majority of children.

(c.) This is not the creation of a new homestead, but a question as to who is entitled to share in the enjoyment of one already existing.

(d.) The answer swears off any equity which might exist in the bill, and the discretion of the chancellor on questions of fact will not be controlled.

March 18, 1884.

Homestead. Husband and Wife. Parent and Child. Injunction. Receiver. Before Judge STEWART. Henry County. At Chambers. January 23, 1884.

Reported in the decision

F. D. Dismuke; N. M. Collens; John I. Hall, for plaintiff in error.

Boynton & Hammond, for defendant.

Jackson, Chief Justice.

Two of the minor children of Benjamin Barfield, by an elder brother as their next friend, brought a bill in equity against their father, praying for an injunction to restrain him from cutting and selling timber off of a homestead estate set apart in the year 1869, at the instance of their mother, now deceased, and for a receiver to take charge of the homestead, that they might receive a support and education therefrom.

The complaint is that their father has married again, and is using the homestead for the benefit of said second wife and her family, and excluding from their just share of it the two minor sons, one eighteen and the other fourteen years of age. They complain that their father drinks to excess and does not send them to school as much as he ought, and is mismanaging the estate by selling off some of it, by application to the judge of the superior court to sell more, and under the influence of his present wife, or some other influence unknown to them, has become alienated from them, and has threatened so to manage the property as to deprive them of all benefit from it, and so destroy its value as not to be of service or profit to his children.

The answer denies squarely the charges of intemperance, or failure to support and school these minors, but declares that the defendant has tried to send these boys to school, and has used parental authority to constrain them to go, as far as was practicable; that the present wife is industrious, and does her full duty, and if treated with courtesy by the boys, will perform her share of the reciprocal obligations to the extent of her ability; that he has raised and educated, as well as he could, six other children, now of age and set-

tled from the homestead, and is in like manner trying to raise and educate these; that he does require them to work, because he deems it for their good; that he has sold a little of the land for provisions for the family, including these boys, of which they got their full share of support and benefit; that the elder of the boys was allowed to cut wood and haul it with his (the father's) team for sale to the Central Railroad, and the wood so hauled and sold was worth the sum of $110.00; and that he has applied to the judge for leave to sell some thirty-five acres more, which could be sold for twenty or twenty five dollars per acre, for reinvestment by order of the judge, as it would leave some four hundred acres of land, with timber enough to keep up the place.

The complainants respond with affidavits of their own, and perhaps one other person, to support some of their charges, but not materially varying the issues between father and sons, or strengthening the case made by the latter. On the hearing, the chancellor refused to grant the application of the father to sell the thirty-five acres, and refused to appoint a receiver and grant an injunction prohibiting his application in the future, for such sale as he may deem necessary, as well as from cutting and selling wood from the estate. To the refusal to appoint the receiver and grant the injunction the complainants excepted. To the denial of leave to sell no exception is taken by the father.

1. It would require a very strong case indeed, supported by clear and convincing proofs, from witnesses entitled to credit and uninfluenced by passion or prejudice, to authorize a court of equity to wrest from the father and head of a family the home in which for many years he had raised and sent out six adult children, and was still raising two others to the best of his ability, and place that home in the hands of a receiver, and thus break it up. It would be to destroy the homestead, to break up the household, to encourage rebellion in children against the father, and to

defy, if not to annul, the writing by the Almighty's finger on the tablet of stone, " Honor thy father and thy mother."

In case of insanity of the father, or such tyrannical and inhuman conduct as would lower him from the scale of manhood and sink him into a brute, equity might intervene with a remedy so harsh towards the old father of a family; but the facts herein disclosed do not approach such a case.   If the chancellor had granted it, and dethroned this father from the head of his table, and turned him out of the home of a protracted life, reluctant as this court always is to interfere with his discretion in granting and refusing applications for a receiver, we would instantly have reversed such an unhallowed judgment. The appointment of the receiver prayed for would have shocked the conscience of civilization, and grieved to the core the heart of Christianity.

2. To have granted the writ of injunction, though not quite so bad, would have been to encourage children to call in question the character and conduct of him who, in the providence of God, gave them being.   Black are the faces, and servants of servants are the children of Ham to this day, because their progenitor mocked at the intoxication of his father and laughed at his nakedness; and sad it is to think that any descendant of those who respectfully covered up that nakedness should encourage minors in charging a parent of his and of theirs, in the courts and before all the world, with incapacity to be a father and the head of a house, because of drunkenness, upon such proof as that offered in this record.

To enjoin him from the legal right to apply to the judge of the superior court for leave to sell and reinvest a part of the homestead estate !   Such an injunction is unheard of in any book of law or any court of equity upon earth. To ask the chancellor to restrain a suitor from bringing a suit and filing a petition to the judge of the, superior court, that is to himself, authorized by the constitution and law of the state, and when he refused to grant the

leave to sell and reinvest, to come to this court and assign error that the chancellor did not enjoin a man from ever, under any new facts, petitioning himself again! Verily, this is a bill brought by minors, and this prayer surely is the prattle of childhood.

But the children demand further, that the father shall cut, and authorize to be cut and sold, no more wood off of the homestead forever, at least while the homestead lasts. So that, if they cannot turn him out and put a receiver in the homestead, or prohibit their father from exercising the right of petition to the court appointed by law to pass on the question of sale of the homestead or a part of it, they beg at least to be permitted to stop him from so using the place as, in his judgment, will best help support the family, themselves included, and send them to the school which they say they love so much, but which the father says even parental authority cannot keep them at. All tends to the same end, the overthrow of parental authority and the rule of some who have left the homestead, by their influence over younger brothers left. The trouble is the second wife. The old man dared to marry again, and *hinc illæ lachrymæ,* tears of sorrow first, of anger now. Well, we think that he had the legal right to marry again.; to take the second wife to his home; to seat her at the head, while he sat at the other end of the table, and to have his minor children of the homestead treat her with respect, or in the language of the old man's answer, to treat her "with courtesy."

By virtue of that marriage she became a member of his household, a participant in the homestead and its support and comforts, and a recipient and beneficiary of the estate whilst it existed; that is, as long as the family lived within the curtilage of home, and was not broken up by the death of parents and the majority of children.

It is true that this court held that, when the children were all of age and gone, and the mother died, the family was at an end, and the homestead ceased and reverted to

the father, free of the homestead uses; and when, in such a case, the father married again, if he'wished a homestead estate, he must apply for it *de novo;* but it has not held, and will not hold, that when children are yet in the family circle, and the head marries again, the second wife does not become a member of the circle and a beneficiary of the homestead as one of the family. See *Gresham vs. Johnson et al.,* 70 *Ga.,* 631 ; *Hall vs. Mathews et al.,* 68 *Ga.,* 490.

In view of the whole affair, as it appears in this record, it is too clear for serious question that the complainants have not made a case which equity will welcome into her temple of justice, and that the chancellor could have done nothing else than refuse the appointment of a receiver and the grant of an injunction.

Even if there might be equity in an effort to break up a household and dethrone its head in extreme cases, this is not one, and if, as alleged in the bill, it were such a case, or approached the neighborhood of being such an one, the answer swears it all off; the chancellor had a right to believe its statements, and this court would not interfere.

Judgment affirmed.